# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | |
|---|---|
| JOSE L. VARGAS,<br><br>Plaintiff,<br><br>v.<br><br>MEGAN J. BRENNAN, Postmaster General of the United States Postal Service,<br><br>Defendant. | Case No. 1:17-cv-05085<br><br>Judge Charles R. Norgle |

## OPINION AND ORDER

Plaintiff Jose L. Vargas ("Plaintiff") filed this action against the Postmaster General ("Defendant") alleging discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, *et seq.*, and a violation of the Americans with Disabilities Act, 42 U.S.C. §12101, *et seq.* Plaintiff filed his first amended complaint on November 16, 2017. Plaintiff specifically alleged discrimination on the basis of race, discrimination on the basis of national origin, retaliation for opposing discrimination, and discrimination on the basis of disability, specifically failure to accommodate. Dkt. 21, and Defendant answered, Dkt. 23, on November 21, 2017. Defendant has now moved for summary judgment. For the following reasons, Defendant's motion for summary judgment is granted as to all claims except the national origin discrimination claim, which is dismissed without prejudice as it has not been administratively exhausted.

## I. BACKGROUND[1]

---

[1] The following undisputed facts were taken from the parties' Local Rule 56.1 statements, including: Defendant's Statement of Material Facts ("Def.'s SOMF"); Plaintiff's Response to Defendant's Statement of Material Facts ("Pl.'s Resp. to Def.'s SOMF"); Plaintiff's Statement of Additional Facts ("Pl.'s SOAF"); and Defendant's Response to Plaintiff's Statement of Additional Facts ("Def.'s Resp. to Pl.'s SOAF"). The Court notes that "[a]ll material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement

1

The facts are as follows. In approximately 2005, Plaintiff began working for the Postal Service as a "City Carrier" at the Romeoville Post Office in Romeoville, Illinois. A City Carrier's duties included casing mail (sorting the mail for easier delivery), carrying the mail, and then delivering the mail. The Postal Service requires City Carriers to be able to carry mail weighing up to 35 pounds in shoulder satchels and to load and unload containers of mail weighing up to 70 pounds. The Romeoville Post Office consists of two separate facilities, one located in Romeoville and the other located in Lockport, under the management of a single Postmaster.

### Facts Relevant to Plaintiff's Injury and the Bureaucratic Injury Claims Process

On May 6, 2008, Plaintiff suffered a foot injury on the job and was diagnosed with plantar fasciitis. Shortly thereafter, Plaintiff filed a claim for worker's compensation indicating that his foot injury was caused by his duties as a carrier. Plaintiff's claim was ultimately accepted, and he was paid medical benefits. As part of his 2008 claim for worker's compensation, Plaintiff completed a CA-2 form claiming compensation.

In July 2010, Plaintiff was the successful bidder on mail route C-27 out of the Romeoville facility. The duties of route C-27 included collections, delivery of express mail, and approximately two hours of miscellaneous functions per day to be assigned by a supervisor. Miscellaneous duties that Plaintiff was asked to perform as part of route C-27 included shuttling mail and equipment weighing up to 75 pounds between the Lockport postal store and the Romeoville Post Office.

In January 2011, Plaintiff filed EEO complaint 4J-604-0001-11 alleging that, among other things, the Postal Service prevented him from delivering mail on route C-27 and prevented him from using his desired vehicle to deliver mail in August and September 2010. In September 2011,

---

of the opposing party." N.D. Ill. L.R. 56.1(b)(3)(C); Banks v. Dart, No. 12 C 4333, 2014 WL 625865, at *2 (N.D. Ill. Feb. 18, 2014).

Plaintiff withdrew EEO complaint 4J-604-0001-11 in its entirety. The administrative case was dismissed with prejudice on November 1, 2011.

In March 2011, Plaintiff's foot pain worsened. Beginning on March 1, 2011, Plaintiff's foot doctor put Plaintiff on work restrictions, including that Plaintiff should not lift or carry heavy weights over 15 pounds. Plaintiff was on vacation from March 1, 2011 through March 13, 2011. Plaintiff intended to return to work on March 14, 2011. Upon return, Plaintiff asked officer-in-charge Chuck Keeney whether he could do part of his route (route C-27). Plaintiff intended to do the collections portion of the route, though, as he admits, there were miscellaneous duties for route C-27 that he could not perform under his work restrictions. Plaintiff asked Keeney to be excused from performing the shuttling mail and equipment portion of route C-27.

After Plaintiff arrived at the Romeoville Post Office on March 14, 2011, he informed supervisor Carol Johnson of his medical restrictions, including the restriction that he not lift more than 15 pounds. After spending some time determining what to do, Johnson sent Plaintiff home. Johnson told Plaintiff that no light duty work was available for him.

Supervisors at the Postal Service told Plaintiff that he needed to submit form CA-2A which is a notice of recurrence of injury form to be transmitted to the U.S. Department of Labor Office of Workers Compensation Programs ("OWCP"). Instead, on March 15, 2011, Plaintiff submitted form CA-2, which is a different claim for compensation to OWCP. On his CA-2 form, Plaintiff wrote that he had plantar fasciitis. He wrote he first became aware of his foot injury on May 6, 2008, and that the injury has continued since that time. On the form, he further asserted that he could no longer perform the essential functions of his position.

After Vargas submitted the CA-2 form, his supervisors repeatedly told him that he had submitted the wrong form and that he was required to submit a CA-2A form because his injury was a recurrence of an injury that had previously been accepted by OWCP.

Keeney believed that a CA-2 form was the appropriate form to submit when an employee was injured for the first time, but that when an employee suffers a recurrence of a previous injury he should complete a CA-2A form instead. Because Plaintiff's injury was a recurrence of the same foot injury he had suffered in 2008, Keeney believed he was required to submit a CA-2A form. Vargas submitted a CA-2A Notice of Recurrence form on March 22, 2011.

On his CA-2A form, Plaintiff wrote that his original foot injury occurred in May 2008, and that the injury had been continuous since that time. He again wrote that he could no longer perform the essential functions of his position.

Plaintiff's CA-2A claim for recurrence was forwarded to the OWCP on March 29, 2011. Between March 15 and March 22, 2011, Plaintiff continued to request a light duty assignment every workday. Postal Service supervisors denied Plaintiff's request, telling him that no light or limited duty work was available for him.

On April 5, 2011, Plaintiff sent a letter to Keeney again asking for light duty work that he could perform according to his medical restrictions. Keeney responded to this letter on April 7, 2011, denying Plaintiff's request for light duty work by stating that no light duty work was available. Plaintiff has admitted that he does not know of any mail routes at the Romeoville Post Office that he would have been able to perform in their entirety under his medical restrictions in the spring of 2011.

In early June 2011, Postal Service management informed Vargas that he was in a light duty status because his CA-2A had not yet been accepted. They also informed him that they never have light duty work available.

Postal Service employees who are injured outside of work and cannot perform their work duties are placed in light duty status and are eligible for light duty work. The Postal Service has claimed that this district's policy was not to split up routes or otherwise alter positions to create light duty work assignments to be performed by employees in light duty status; Plaintiff has disputed this assertion, pointing to Keeney deposition testimony in which Keeney stated that in certain limited circumstances, including where there were multiple sick calls from carriers on the same day, routes were split among carriers. District supervisors Keeney and Johnson do not know of any instance in which a Postal Service employee in light duty status was given light duty work.

Within the Postal Service, a distinction exists between "light duty" and "limited duty." Postal Service employees who are injured on the job and whose claims for workers compensation have been accepted are placed in *limited duty* status and are eligible for limited duty work. A Postal Service employee whose claim that he was injured at work has not yet been accepted by OWCP is not eligible for limited duty work. After an employee's workers compensation claim is accepted by OWCP, the Postal Service will provide a limited duty assignment to the employee during the recovery process. If a full-time limited duty assignment is not available given the employee's work restrictions, workers compensation will pay for the difference between the amount of limited duty work that is available and full-time. OWCP determines whether a Postal Service employee is entitled to workers compensation benefits.

When Plaintiff submitted his CA-2A form, Keeney was responsible for sending the form to the district office to be processed. Keeney had no involvement in approving or disapproving

5

Plaintiff's claim. In May and June 2011 Keeney attempted to check on the status of Plaintiff's OWCP case. The response the Postal Service received from the Department of Labor was that as of June 15, 2011, the case had not been accepted. The Department of Labor also warned that it usually takes 90 days or more for a decision on claims.

On June 8, 2011, OWCP contacted Plaintiff about his claim for recurrence and informed him that is case was currently open. On June 9, 2011, Plaintiff stated that he had called OWCP several times and had been told that his CA-2A claim was still pending.

On October 26, 2011, OWCP accepted Plaintiff's workers compensation claim for recurrence. OWCP further notified Vargas that compensation for his leave without pay for the dates between June 27, 2011 and September 29, 2011, would be forthcoming. On October 27, 2011, Keeney offered Plaintiff a limited duty assignment in which he was asked to case mail for one hour per day. During his limited duty assignment, in addition to being paid for one hour per workday for casing mail, Plaintiff was paid seven additional hours by workers compensation.

Plaintiff's Time and Attendance Collection System Report indicates that on March 14, 2011, Plaintiff was credited for working 2.6 hours and the remaining 5.4 hours were credited as paid sick leave. Between March 15 and May 7, Plaintiff continued to take paid sick leave. From May 10 through May 14, Plaintiff took paid annual leave. From May 16 through June 27, Plaintiff again took paid sick leave. Beginning on June 27, 2011, Plaintiff was placed on leave without pay.

Beginning on October 31, 2011 through November 15, 2011, Plaintiff was paid for the approximately one hour per day that he worked and he received OWCP compensation for the remaining seven hours of the day. Beginning on November 16, 2011, Vargas was paid for the eight hours he worked per day.

After OWCP accepted Vargas's claim for recurrence, Vargas was paid for the period June 27, 2011 through November 4, 2011, during which he had previously been in a leave without pay status.

### Facts Relevant to the Reassignment of Plaintiff's Mail Route

In the Postal Service, mail routes are assigned by seniority. Whenever a route becomes available, that route goes up for bid, and the carrier in the office with the highest seniority who wants the route will get it. Seniority is the only factor considered when assigning routes. In May 2011, the Postal Service performed a route adjustment and nearly every route in the Romeoville Post Office was put up for bid.

Plaintiff's former route, route C-27, was bid on by another carrier, Ed Pearce. Pearce was more senior than Plaintiff. Therefore he was entitled to select a route before Plaintiff. When it was Plaintiff's turn to bid on a new route, he selected route C-17. Plaintiff does not know of any less senior carrier who was allowed to select a route that he wanted.

When a route is put up for bid, Postal Service policy dictates that "proposed adjustments . . . will be communicated with the carrier in advance of implementing route adjustments." Dkt. 45-1, at 1. Moreover, the carrier is supposed to receive a written statement related to the proposed adjustment. Vargas claims that the Postal Service violated his rights by not informing him of the route adjustment and re-bidding in advance. Plaintiff admits that earlier notice about a route adjustment would not allow a less senior carrier to take a route away from someone who is more senior.

### Procedural History

Plaintiff first initiated contact with an EEO counselor on April 28, 2011, complaining that he had been told there was no light or limited duty work available for him. In June 2011, Plaintiff

filed EEO complaint 4J-604-0081-11. In his EEOC complaint, Plaintiff alleged that he was discriminated against between March 14 and March 22, 2011, when the Postal Service refused to give him light or limited duty work. Vargas checked the boxes stating that he was alleging race, retaliation, and disability discrimination. Plaintiff did not check the box indicating national origin discrimination.

Plaintiff's EEO claim was ultimately denied, he appealed, and the EEOC affirmed the decision that Plaintiff was not subjected to disparate treatment discrimination based on race, disability, or reprisal, and that he was not denied a reasonable accommodation. This suit followed.

## II. DISCUSSION

### A. Standard of Review

"Summary judgment is appropriate when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Northfield Ins. Co. v. City of Waukegan, 701 F.3d 1124, 1128 (7th Cir. 2012) (quoting Fed. R. Civ. P. 56(a)); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Wells v. Coker, 707 F.3d 756, 760 (7th Cir. 2013) (internal quotation marks and citation omitted). "On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). The Court must view "the record in the light most favorable to the nonmovant and [avoid] the temptation to decide which party's version of the facts is more likely true." Id. Finally, "to survive summary judgment, the nonmoving party must present

evidence sufficient to establish a triable issue of fact on all essential elements of its case." Lewis v. CITGO Petroleum Corp., 561 F.3d 698, 702 (7th Cir. 2009).

### B. Plaintiff's National Origin Claim and Claims Relating to Conduct Before March 14, 2011

As an initial matter, a Title VII plaintiff may not bring claims in a lawsuit that were not included in his administrative complaint. Jennings v. Panetta, 492 Fed. App'x 698, 699 (7th Cir. 2012); Teal v. Potter, 559 F.3d 687, 691 (7th Cir. 2009). An exception to the exhaustion requirement exists for claims that are "like or reasonably related" to the charge and "can be reasonably expected to grow out of an [agency] investigation of the charge." Sitar v. Ind. Dep't of Transp., 344 F.3d 720, 726 (7th Cir. 2003).

Plaintiff argues that his national origin claim falls within this exception to the exhaustion requirement because "[w]hile Plaintiff did not check the box for national origin discrimination, his national origin discrimination claim arose out of the same set of facts, and was reasonably related to his claims of race and disability discrimination and retaliation." Dkt. 46, at 2-3.

The Court disagrees. The totality of the relevant EEOC complaint stated as follows:

> March 14, 2011 I was sent home by Ken Kronberg that was on the phone instructing Carol Johnson to send me home. Carol Johnson said if I use sick leave I would not be able to buy it back because they never have lite [sic] duty work for me. March 15-21, 2011 I was sent home because Robert Clark and Carol Johnson said that they never have any lite or limited duty for me. There has been other city carriers that were able to work lite or limited duty work. Management accommodated them but not me. (See attachments.) March 22, 2011 I was forced by management Chuck Keeney to submit a CA2A after I submitted a CA-2 that they failed to process. See attachment.

Dkt. 38-2, at 308. The EEO complaint, which was dated June 9, 2011, contained checked boxes for race and disability discrimination and for retaliation for specific prior EEO activity. The box for national origin was not checked.

Even liberally construed, it is unclear how any claim related to national origin discrimination would be discovered in the course of investigating the other claims arising out of these barebones allegations. Plaintiff effectively argues that any claim related to race encompasses within it a claim related to national origin. This is an improper application of the law and as such the national origin claim has not been exhausted.

Moreover, Defendant argues that claim is limited in its temporal scope to actions taking place in March 2011. Plaintiff did not address this timing argument in its brief. The Court agrees with Defendant on this point and as such the national origin claim and any claim purporting to deal with actions prior to March 2011 are dismissed without prejudice.[2]

### C. Plaintiff's Claims Related to His Injury

The ADA prohibits employers from taking adverse employment actions against their employees because of a disability. 42 U.S.C. § 12112(a). Plaintiff claims that the Postal Service has failed to accommodate his disability in violation of the ADA. To establish a claim for failure to accommodate, Plaintiff must show that: "(1) he is a qualified individual with a disability; (2) the Postal Service was aware of his disability; and (3) the Postal Service failed to reasonably accommodate that disability." Preddie v. Bartholomew Cons. Sch. Corp., 799 F.3d 806, 813 (7th Cir. 2015).

Defendant attacks this claim on two grounds. First, Defendant argues that Plaintiff does not meet the definition be being a "qualified individual" under the statute. Second, Defendant argues that even if Plaintiff is a qualified individual, he still loses on summary judgment because the accommodation he asked for was not reasonable because, in effect, Plaintiff was requesting

---

[2] The Court reads Plaintiffs allegations to deal with actions occurring in or after March 2011 regardless of this argument as to timeliness. The Court thus views this argument essentially as a moot point but in light of Plaintiff's lack of response will adopt the Defendant's position.

the Postal Service to split up his duties or create a new position for Plaintiff. The record contains evidence that could support a finding that Plaintiff was a qualified individual for purposes of the ADA, but the Court agrees with Defendant on its second point as to the reasonableness of the requested accommodation, and thus grants summary judgment as to the ADA claim on this latter ground.

1. <u>Some evidence suggests that Plaintiff may have been a qualified individual.</u>

The ADA defines a "qualified individual" with a disability as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). On the record before the Court, it cannot be said as a matter of law that Plaintiff does not meet the definition of a qualified individual under the ADA.

Defendant argues that Plaintiff cannot perform the essential functions of the mail carrier job and as such he does not qualify for protection under the ADA. Dkt. 37, at 8 (citing 29 C.F.R. § 1630.2(n)(2)(1)). Defendant points to two main types of evidence in making this argument—(1) two "admissions" by Plaintiff in his worker's compensation paperwork in which he wrote he "could no longer perform the essential functions of [his] position," DSOF ¶¶ 14, 18, and (2) the written job requirements for a mail carrier and published by the Postal Service.

As to this first contention, Defendant attaches much weight to what it classifies as an admission by Plaintiff in his EEOC charge that he could not perform the essential functions of the mail carrier position. The Court hesitates to attribute controlling weight to these statements, which were made by a lay person who likely was unaware of the legal significance of those terms at the time he wrote them.

Moreover, as to what the "essential functions" of his job were, and whether lifting more than 15 pounds was one such essential function (recall that Plaintiff's doctor restricted him to listing no more than 15 pounds beginning in March 2011), there is evidence that could cut in Plaintiff's favor on this point, and thus summary judgment would be improper on this ground. See Feldman v. Olin Corp., 692 F.3d 748, 756 (7th Cir. 2012).

Specifically, the job description for a general mail carrier is as follows:

> Delivers and collects mail on foot or by vehicle under varying road and weather conditions in a prescribed area, maintains professional and effective public relations with customers and others, requiring a general familiarity with postal laws, regulations, products and procedures commonly used, and with the geography of the area. May be required to carry mail weighing up to 35 pounds in shoulder satchels or other equipment and to load or unload container of mail weighing up to 70 pounds.

The description as to the specific route in question, C-27, stated the following:

> Qualifications: Ability to case and carry all mail distributed to your route in a safe and efficient manner and [maintain] a valid state driver's license. The employee is required to maintain and stay qualified with (CDL) license. [Additionally], required to stay qualified on 2 ton vehicle. Route will not be awarded until qualified on CDL and 2 ton.

> Bidders: Only regular city carriers are able to bid.

The fact that the general mail carrier position uses the term "may" in its sentence related to the lifting requirements leaves some ambiguity as to whether, in a given circumstance, lifting 35 pounds in a shoulder satchel and containers up to 70 pounds is an essential requirement of the job. Although common sense would weigh in favor of a finding that carrying these quantities of mail would be an essential function, the Court will not make that determination as a matter of law at summary judgment. Moreover, the C-27 notice of vacancy contained no explicit reference to lifting. On this record, summary judgment would be improper.

2. The Requested Accommodations Were Not Reasonable

The ADA obligates an employer to provide a qualified individual with a reasonable accommodation. See, e.g., Rehling v. City of Chicago, 207 F.3d 1009, 1014 (7th Cir.2000); see also 42 U.S.C. § 12111(9)(B) (listing examples of reasonable accommodations). "For instance, an employer may be required to reassign a disabled employee to a vacant position if the employee no longer can perform the essential functions of the job she holds." Majors v. General Elec. Co., 714 F.3d 527, 534 (7th Cir. 2013). However, the employer is not required to "manufacture a job that will enable the disabled worker to work despite his disability." Id. (citing Hansen v. Henderson, 233 F.3d 521, 523 (7th Cir. 2000). "The employer need only transfer the employee to a position for which the employee is otherwise qualified." Jackson v. City of Chicago, 414 F.3d 806, 812-13 (7th Cir. 2005).

In this case, Plaintiff admits that he requested to do only a portion of his route and that he be excused from performing the shuttling mail and moving equipment portion of the route. Dkt. 44, at 3. In essence, this request was for the Postal Service to manufacture a new position for Vargas, which the law does not require. Dargis v. Sheahan, 526 F.3d 981, 987 (7th Cir. 2008). Plaintiff specifically argues that others had been given this kind of accommodation—which at times is referenced as "light duty" in his briefing. According to Plaintiff, the Postal Service would at times allow others—specifically individuals of different races from Plaintiff—to work light duty. In this way, Plaintiff makes a blended argument that he was not reasonably accommodated for his disability, and the underlying basis for the Postal Service's failure to accommodate was motivated by racial discrimination.

Plaintiff has provided no evidence to support either contention. First, as noted above, the Postal Service was not required to make up a new position for Plaintiff or to divvy up his work

13

among multiple people. Second, Plaintiff has provided no evidence at all to support the contention that the failure to accommodate was motivated by racial animus. On this latter point, Plaintiff has attempted to provide evidence to suggest that similarly situated individuals of different races were treated differently than Plaintiff. Specifically, Plaintiff points to a number of individuals who were injured on or outside the job and were later given accommodations.

The Court agrees with the Postal Service that these individuals are not similarly situated to Plaintiff. The key distinction in each instance is the difference between "light" duty and "limited" duty. Postal Service employees who are injured outside of work and cannot perform their work duties are placed in light duty status and are eligible for light duty work. Postal Service employees who are injured on the job and whose claims for worker's compensation have been accepted are placed in limited duty status and are eligible for limited duty work.

Plaintiff in this case asked to be accommodated by requesting "light" duty work prior to the OWCP's determination as to his workers compensation claim related to his reinjury. Plaintiff has provided no evidence to suggest that others were given light duty work prior to the acceptance of their workers compensation claim. To the contrary, Plaintiff's evidence is consistent with the Postal Service supervisors' testimony that a policy was in place not to give light duty work, but rather to wait until the OWCP had accepted an injury claim and then assign the injured individual to limited, not light, duty work. This is precisely what happened to Plaintiff. On these facts, Plaintiff fails as a matter of law.

Once Plaintiff followed the proper bureaucratic procedures, he was accommodated. In this respect he was treated the same as the other employees he has compared himself to and consistent with the policies of this Postal Service district.

**D. Plaintiff's Claim Related to the Route Readjustments**

14

The Court agrees with the Postal Service that Plaintiff's receipt of late notice as to a rebidding of the various routes in that district was not an adverse employment action. To show an adverse employment action, a plaintiff "must show some quantitative or qualitative change in the terms or conditions of his employment." Johnson v. Cambridge Indus., Inc., 325 F.3d 892, 901 (7th Cir. 2003). There are three general categories of actionable, materially adverse employment actions: (1) termination or reduction in compensation; (2) transfers or changes in job duties; and (3) unbearable changes in job conditions. Barton v. Zimmer, Inc., 662 F.3d 448, 453-54 (7th Cir. 2011).

Plaintiff's theory with respect to the late notice of the route readjustment, as he argues in his response to summary judgment, is that he could have challenged the readjustment. Plaintiff has offered no evidence to suggest that such a challenge would have had any impact on the decision to move forward with the readjustment. Plaintiff's entire claim is speculative and unsupported by evidence, and as such the Court enters summary judgment as to this claim as well.

### III. CONCLUSION

Consistent with the above, summary judgment is granted in favor of Defendants as to Plaintiff's ADA and racial discrimination claims. Plaintiff's national origin claim is dismissed without prejudice.

IT IS SO ORDERED.

ENTER: *Charles Norgle*
CHARLES RONALD NORGLE, Judge
United States District Court

DATE: December 30, 2019